Case number 233930 Victor Cousens et al. v. City of Forest Park OH et al. Oral argument not to exceed 15 minutes per side. Mr. Mezebov, you may proceed for the appellants. Good morning, Your Honors. May it please the Court, Counsel, my name is Mark Mezebov. I represent Victor Cousens and the IBC, the Inspirational Baptist Church. Is the church a party to the appeal? Yes, Your Honor. The rights of the congregants were affected in this. I noticed your notice of appeal only identifies the Reverend Cousens as the appellant. If that's true and I that was inadvertent, Your Honor, if that's the case. Is Reverend Cousens still the pastor of the church? Yes, he is. He moved to Florida. He was commuting, but he is back in town. The church is still functional. And is the church continuing to meet? Yes. With Pastor Cousens as the minister? Correct. Did they vote him back in or did he just step back in? The question of formalities here, I think, is up in the air as to what... Generally, if a church votes the pastor out, they'd need to vote him back in, wouldn't they? Well, that's an issue. In our view, he was never voted out according to the church's rules and bylaws. So he came back in the church and nothing further was ever done. He just came back and sat down in a chair and he was the pastor. He resumed his role. I should tell the court, the court knows from the briefing that the church members at one time tried to bring this matter to court to get a cease and desist or a trespass protective order from the court with respect to Bishop Cousens. And the court took the case and dismissed it on the grounds that there was an ecclesiastical question here and it's not proper for civil courts to intervene in this matter, which is part and parcel of our argument here with respect to both the First Amendment and the Fourth Amendment claims. How do you say that the church like this would call somebody to be the pastor or does he just walk in the door and say, God... No, there were formalities employed by the church. There were formalities attendant his role as the church pastor. It was not an informal organization. The violations of the rules of the church were committed by the people who tried to defrock, if you will, Bishop Cousens. This is a congregational model church, not as opposed to a hierarchical church? Your Honor, I'm not expert. Well, for instance, is there a body that is above this church in the church hierarchy that has some authority over this church? I'm not aware that it's... if that's what the court means by a hierarchical church, I'm not sure that there's a higher ecclesiastical body that oversees this church. So it's plaintiff's intention that he, Cousens, is the head of this church? Yes. He is ordained, he was employed by and conducted services for and on behalf of this church for any number of years. And what is his position as to how he can be removed, if at all, from that position? There can be a proper vote taken by the right number of people at the right time and place with the right notice. And what is the proper procedure for removal of him as pastor? What would have been the... what would be the proper procedure for removal of him as pastor? Give the congregation, everybody, notice of a vote, have everybody who's eligible to attend attend a proper quorum and have a proper vote. And that would be pursuant to the bylaws of the church? Yes. Any other document or factor that would affect whether or not the meeting was legal? Not that I'm aware of. Okay. Now, there are two arguments that we bring, two essential claims that we bring. There are more claims than the two of them to address, but I do want to address both the Fourth Amendment and the First Amendment claims, if I might. First, the Fourth Amendment. In February 2020, two dissident members of the IBC hired officers from the Forest Park Police Department to provide an off-duty detail during a Sunday morning service. The express purpose of the detail was to prevent Bishop Cousins from leading that morning's prayer service at risk of being physically arrested for failing to leave the pulpit. According to the district court, the officers' actions were reasonable, and for that reason did not violate the Fourth Amendment prohibition of unreasonable searches and seizures. We disagree. The district court's decision on the reasonableness of the officers' actions was predicated almost entirely on the strength of a single document carrying IBC letterhead purporting to divest Bishop Cousins of his employment and role as a pastoral leader of the church. Does this document the Exhibit 3 from the Dreyer deposition? Yeah, sure, the number, your Honor, I think it is, exactly. I noticed that the letter makes reference to a demand to vacate the premises, C attached. Correct. I didn't see in the record the notice to demand to vacate the premises. Is that in the record? No, the only notice that I'm aware of is this, and to vacate the premises alludes to his leaving his office. He had an office in the church, and I think that's what it references, because their position, their position meaning the members who brought this action, as well as the police officers, was that Bishop Cousins was not to be barred from the premises, but he was to be prevented from assuming the pulpit and conducting services as the pastoral leader of the church. So that in itself raises questions which I want to address about the deficiencies and suspicious nature of this document, insofar as it supposedly authorized the police officers to keep pastors, keep Cousins off the premises. What about the letter is suspicious? Well, number one, again, looking at the police officers testimony as to what they relied on, the testimony is very equivocal and ambiguous as to whether this document in their minds had legitimacy, although one of the officers said it was legit. But if you look at the face of the document, number one, it's not a court order, and that is a primary concern according to this court in the Hensley case. It's not a court order. It's a document prepared by somebody at the church. It had the church letterhead on it, so we know it's not an order. So number one, that's suspicious. Number two, the person who presented this document to the police and hired the detail was virtually a stranger to the police department. It's not somebody with whom they've worked on behalf of the church, and we know in Fourth Amendment cases, if you're going to get a warrant based on the word of some informer, you have to provide some evidence that this man is a reliable informer. First of all, of course, there was no warrant. There was no court order. The document itself does not say, keep him out of the church. It says you're fired. You're fired, Bishop Cousins. It doesn't talk about trespassing, but yet that was the detail was to serve, was to treat Bishop Cousins as a trespasser. There was nothing here about trespassing, but on top of all this, and I'm really talking to the reasonableness of the decision and why we think the district court went astray. We agree that this is a totality of the circumstances analysis, so we don't quibble with that. What kind of damages do you have here, just pain and suffering because he had to step down out of the pulpit? Virtually. It's twofold, Your Honor. One, he was in front of the church and the congregation, humiliated, embarrassed, marched out of the church, and at the same time, and now we go to the First Amendment, he was also prevented from engaging in ecclesiastical matters, in conducting services, in engaging in religion, as was, while this disruption was taking place, so too was the congregation. That's why we have Fourth Amendment violations and we have First Amendment violations, but I agree, yes, it's not primarily an economics case. It's something else, but there is value. There is harm when your rights under the Fourth Amendment and or your rights under the First Amendment are violated. He was back in the pulpit the next Sunday. He went back in the pulpit, which talks about, doesn't it, the legitimacy and the veracity of the representation of these dissident members that Bishop Cousins was removed. He wasn't. They tried to do it, but the people who came to the church that morning were there expecting to see Bishop Cousins, and the police talked about, well, there was tension in the air and there was, they say there was chaos, but there was no, there was no danger of, but the point is, there are an awful lot of people there who were in there and supported Bishop Cousins. This was an internecine, if you will, dispute between members of the church and the police, certainly civil authority, and especially police had no right to intervene and take a side, and that's what they did. Thank you. Thank you. Good morning, your honors. My name is Katie Barbier. I'm from the law firm Schroeder Mondrell Barbier and Powers. I'm here on behalf of the Appalachians, the City of Forest Park defendants. To address some of the arguments offered by counsel in the support of Bishop Cousins, I wanted to kind of address some of the factual elements that he brought up in response to some questions from your honors. For one thing, with respect to the letter that was presented to the police department, one, it was on church letterhead. Two, it was presented to the police department by a member of the congregation who had previously hired the police department for an off-duty detail. The Sergeant Dreyer, who is the off-duty detailed booking officer for the City of Forest Park, she testified that there was not a regular contact with the church with respect to the off-duty details, that it was just whomever was booking them that day, that it was extremely normal for the City of Forest Park to be engaged in an off-duty detail with respect to the IBC church because they were there to provide general security. There's testimony in the record that IBC also engaged their own private security with respect to church services, so there were people there armed on behalf of the church and there were also officers there on a fairly regular basis at this church. There is no question that the officers were doubting the legitimacy of this correspondence that they were shown. I mean, they all testified that it looked legitimate to them, there were not internal inconsistencies as determined by the district court, and the officers all testified, and I don't believe it was ambiguous at all, that their understanding of the detail was to provide general security. The officers testified they were aware that there was inner turmoil with the church, they did not testify that they were aware Bishop Cousins was contesting in any way his firing from or his ousting as the bishop over the church, so they testified they were believed they were there for general security and that they were understood that there was inner turmoil going on at the church. So Bishop Cousins did not object when they tried to tell him he needed to come down from the pulpit? Did he not object in that instance? The testimony in the record is that Bishop Cousins' wife, who was sitting on the pulpit with him, whispered to him to say, if you don't get off this pulpit, they're going to arrest you. And the testimony is that Bishop Cousins then descended from the pulpit on his own, came into the hallway outside of the church worship area, and the officer said to him, you know, this is the testimony we're taking as true for purposes of summary judgment, you know, you have to leave or we're going to arrest you. And this was due to basically the chaos that was now going on with respect to the church. I guess what I'm saying is, is there any verbal statement by Bishop Cousins that he objected to what the officers were doing? His testimony is that he said I'll leave but it's under duress, essentially, that I don't want to leave but I will. It wasn't like any kind of physical altercation, you know, the officers never touched Bishop Cousins, there was no handcuffs, there was no physical contact of any kind. Was there any discussion with Bishop Cousins about this letter that the officers had? The officer presented the letter to Bishop Cousins and said this is what we've received, this is what we're acting under, and you know, that was I think the extent of the testimony with respect to Bishop Cousins' reaction to that. Did Bishop Cousins say anything specifically objecting to anything in the letter? Not, not in the testimony in this record, Your Honor. So with respect to the district court's decision, well, first of all, the district court found that there was a question of fact as to whether there was a seizure that occurred in this case, and we would submit that there was no seizure here, that the officers simply were guiding Bishop Cousins out of an area where he was no longer permitted to be, and this was one due to the letter, due to the disturbance of the peace that was now ongoing within the department. And in the briefing, Your Honor, we cited this court to the case which is Ucana versus the City of Sterling Heights, which is a 2019 decision, and that decision held that, you know, if a police officer orders a person to leave public areas, such police conduct without more is not a seizure under the Fourth Amendment. Now the appellant takes issue in their briefing that this was not a public area, this was a private area, but we would submit that the holding in Ucana and the reasoning behind it really supports the finding that even if this was a private area, the Ucana decision would control here, because the finding in Ucana was that we are inclined to agree with the Second Circuit, at least in circumstances where the person being asked to leave is not privileged to remain in the space, either because the space is no longer open to the public, for example, a building is closing or the space must be cleared of all people for safety reasons, or because the person's behavior violated a rule, ordinance, or law, for example, by causing a disturbance. So it's our position, and we have we've argued at summary judgment, we've argued in front of this court, that there's no seizure here, that Bishop Cousins was merely asked to leave, he was no longer permitted to remain in the space, the officers were simply guiding out of an area, they were not controlling his movements, that he was free to go wherever he ever he wished as long as he didn't remain in the area. And we've already kind of established, we've discussed, I've argued before this court with respect to the fact that even if... So let me ask you, Ucana then, are you saying, how about this case called Bennett v. City of East Point? Sure, yes, your honor. Are you saying Ucana somehow limits that case? Well, I just think they're factually distinguishable. The Bennett versus the City of East Point, that case was found that the plaintiff, who was a bicycle rider, was otherwise on public land, otherwise permitted to be where he was, and the officers were essentially, I think that the factual circumstance to that was it was like an affluent neighborhood in the Detroit area, and they were trying to keep bicycle riders off the public streets there. And in that case, the bicycle rider was unquestionably in an area where he was permitted to be. And that's where that's the difference, that's the distinguishing factor in Ucana, and what would I think distinguish in our case too, is that Bishop Cousins was no longer free to be where he was based upon the correspondence, and based upon, again, the disturbance of the peace that was now going on with respect to the congregants in the church. So your honor, even if, as I was arguing, even if there was found to be a seizure in this case, which we submit there was not, the seizure would not have been unreasonable. Now there was some citations in the brief with respect to the Hensley and Middaw cases, which are to do with repossession of cars, that plaintiff, I think the appellant has submitted, would be more controlling here, because in those cases there's certain elements which, for a civil servant to get involved in a private dispute. And that's just really not what was going on here. As we've said at the outset, that this was a case where the officers were there just for general security, were to keep the peace. They were not getting involved in a private dispute. They had no interest in the outcome of what was going on here. The officers were not aware that Cousins' position in the church was a contested matter. The officers were not making any kind of determination as to who could address the congregation. I mean, the church leaders made that determination. The church leaders were the ones who took the vote, who wrote the letter, who contacted the police officers. And the church elders had that right, had that right to prohibit Bishop Cousins from addressing the congregation. And the police officers were merely keeping the peace within the congregation. Addressing the next, that was the Fourth Amendment claim. Addressing the First Amendment claim, which was raised on this appeal, the plaintiff, to carry a burden on a free exercise of religion claim, the must prove that the government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable. And that's the Kennedy versus Bremerton case. And in this case, there is no policy. There has not been argument that there's a policy here that would have any bearing on the ability of the IBC congregants to worship. Now, the city of Forest Park has no interest in the IBC church, has no interest in what goes on there at the church, other than to keep general security or keep the peace with respect to these off-duty details. So without a policy, we would submit there is no burden on the free exercise of religion here. Now, there was citations in the brief from the appellant of the Family Worship Center Pentecostal Church of Holiness, which is a case out of the Eastern District of Wisconsin. It's a district court case, which, you know, outside of our district here. But in that case, what the facts, which I think are extremely factually distinct from the case where we're here today, is the suspect, who I guess had submitted that he was interested in or he was trying to elicit a suicide by cop, ran into a church and commenced praying after committing a crime outside of the church. The police followed him in. They, you know, took him into custody. They separated the pastor from the congregation in that case. They separated parents from children. They told people to shut up. They stayed for a very long time in the worship center, and they called backup. And it was an extremely extended police, you know, presence at that congregation. And the court in that case found that there was a question of fact as to whether that was a burden on a religious exercise, even without a policy, you know, from the police department. So where our case could not be more factually distinct from that, we would suggest that the police didn't stay long enough to interrupt services. The police, once Bishop Cousins, you know, descended from the pulpit, the police essentially left, left the church. I mean, the congregation went on. The services resumed. There was, I think, Sergeant Davis testified that, you know, while Bishop Cousins was still there, there was chaos. There was someone trying to rip the microphone out of people's hands. There was tampering with the sound descended from the pulpit, and the police presence was not a disturbance with respect to further church services. Had they taken a vote already in the congregation before this event happened, take a vote to oust the bishop? Yes. That occurred before this, and that was what generated the letter to Bishop Cousins indicating that, you know, he was no longer employed by the IBC. Now, they were also, those church leaders, I think, were also part of the suit. They're not part of this appeal, so their claims were kind of litigated as part of ours, and that there was a lengthy reason that the church elders were dissatisfied with Bishop Cousins, which was not, you know, known to the police officers, but that had all kind of been, that happened prior to this event. Is it the city's position that Bishop Cousins was properly removed as pastor, or is it your position maybe that the officers just made a mistake? Yeah, the city doesn't have a position on the proprietary, the propriety of how the church elders handled Bishop Cousins. They're not aware of what the rules and regulations of the church were. The city is simply, even if it was a mistake, which we would submit would still, you know, allow, there would be no constitutional violation here. It would also entitle the officers to qualified immunity, which hasn't really been addressed yet, but I would submit as appropriate here. We would still have to get to the constitutional violation, whether there was one or not, for the city, the claims against the city, wouldn't we? Correct, yes. So for the first prong of the qualified immunity analysis, correct, and we would submit there's no constitutional violations here. The district court found that, you know, there was a question of facts as to the seizure, but that it wasn't unreasonable, and they found no constitutional violation. The district court found no violation of the First Amendment rights, and then he found, the there was no policy or procedure adopted by the city of Forest Park that would entitle the plaintiffs any kind of constitutional. And would you say the reasonableness inquiry turns upon whether or not this letter alone is, was enough for the officers to act upon? That's what the district court relied upon. I, we would also submit that the officers, you know, on the scene, you know, observations and conduct, I mean, it's the reasonable officer standard. The fact that, you know, there was a disturbance, the fact that the congregation was kind of becoming an uproar as Bishop Cousins' presence continued at the IBC, we would suggest would also go into the reasonableness factor of just asking office, just asking Bishop Cousins to please, you know, vacate the premises. But the district court did say that the fact that the letter from the church had no internal inconsistencies, appeared legitimate, was on stationary from the church, was signed by church elders. I mean, that would give the officers no reason to doubt the correspondence or the legitimacy of it. So with respect to your honors, with respect to qualified immunity, as we've said, under the first prong, I would suggest there is no constitutional violation here, such that we wouldn't even have to get to whether it was clearly established. But it was certainly no clearly established law on point that has emerged any of the briefing. And in fact, I believe it's some, it's conceded in the, at least in the briefing in this, our Sixth Circuit, that by the appellant, that there's no clearly established case law on point here. So if the officer, if your honors were to even consider a constitutional violation, the officers would then be entitled to qualified immunity. As I've kind of touched on before, your honors, we submit that Chief Ahrens, he's only sued in his official capacity. So that, you know, we submit as a suit against the entity. We do not believe there are any policies or customs that would subject the department to Monell liability, the city to Monell liability. The civil conspiracy claim was also an element that was decided by the district court. I think, your honors, the civil conspiracy in 1983 would be the only issue remaining. I believe the civil conspiracy under Ohio law has been waived as it has not been addressed in any of the briefing. And with respect to waiver, we would also suggest that there's been no argument in this court with respect to substitute due process or the unreasonable search that was raised in the complaint that was initially filed with this court. What's your position on whether the church is a party to the appeal? The church didn't, I would submit they're not. I mean, the church didn't participate in the appeal with respect to the notice that was filed and it hasn't been part of the briefing. So, your honor, I mean, this appears to be an appeal on behalf of Bishop Cousins. And so, I guess, seeing that my time is essentially ending, I would just ask this court, we would respectfully request the court affirm the decision of the district courts. And unless there are any further questions, I will move my time. Thank you. Thank you, your honors. Rebuttal? Yes, sir. Thank you. Your honor, very briefly, several points, however. First of all, with respect to the contention of counsel that Mr. Jones went to the church just to obtain general security, that's not the testimony. The testimony was clear from Officer Hall and Officer Harris, that they were there specifically to keep Bishop Cousins off the pulpit. This was not just a general security. This was unusual. The testimony was that no one knew Jones from Adam. So to speak. Whenever they had dealt with the church, they were aware that Bishop Cousins was the pastor. The testimony is also clear, and it's either from Hall or from Harris, that they knew there was a legal dispute between Bishop Cousins and the church. So, they know there was an internal church matter. And the idea that, so, this case should not rise or fall on the legitimacy or the suspicious nature of this letter. The fact of the matter is that police had no business going into a church on a Sunday morning in the middle of a service to ostensibly keep the peace when there was no disturbance requiring keeping the peace. Is it your position that there was, it would have been an order, a court order was required? Yes. Nothing short of a court order would justify. Well, the Hensley case, no, I believe that there could have been less than a court order, but the Hensley case talks about game changer with respect to whether the document in question is a court order or not. Well, number one, there wasn't a court order. Number two, there was no probable cause that Bishop Cousins should have been arrested. You have to have, we're going back to Terry's standard, and it's all in our brief. And there were no exigent circumstances. Well, I mean, I guess the argument would be that it would be criminal trespass, that he didn't have the authority to continue to be on the pulpit. Well, the testimony from all the police officers was, we were told he could come into the church, but he couldn't run the service. He couldn't act as the pastor. Now, that's a matter not for the police to determine. That's a matter for church authorities to decide, or for the church itself. That's what the separation of church and state is all about. And there's nothing in the letter about saying I'm keeping him off the premises, other to get your stuff out of your office. But the testimony is clear. He could come in the church. He just could not lead the service. Now, with respect to Judge Bush, you asked counsel, what did Cousins say at the pulpit when the police officer approached him? And I'll refer the court to our brief at page seven. Quote, when Bishop Cousins asked him for documentation, this is asking Hall from the court requiring him to leave the church, Sergeant Hall told him, quotes, I don't have to have anything from the court. I am a police officer. You are a trespasser. And if you don't leave, I'm going to arrest you. That's what he was told. That's how that has a greater ring of truth than, oh, hello, Bishop Cousins. We're here because you shouldn't be here. So would you kindly leave? Sure, I'll leave. Now, that's... Officers had been invited into the church, right? And it wasn't your client's position to invite them in, but they invited them in and had this document showing that they were supposed to come in, right? Right, but the fact that they were there didn't mean that they could take him off the church, off the pulpit. Note, the document in question does not say you were not to, you cannot go in the church. And the testimony is consistent with that. What they said was, you have to leave the pulpit. That's what Hall told them. You need to leave the pulpit. We're going to consider you a trespasser for being on the pulpit. And we're going to escort you out or arrest you. And that's what the wife told him. The police officer had told the wife, if your husband doesn't leave, we're going to drag him off and arrest him and then drag him off. That's the testimony. So the question again becomes, by what authority does civil law enforcement people come in to take a side in a dispute which was intra-church totally? They took a side. They took a side of who was running the church, and that wasn't their decision to make, nor their authority to enforce. Now, with respect to the qualified immunity, because I know I'm running out of time, I understand. I'm not in dispute that these facts may never have been recorded in any previous case. The facts are strange. The facts may well be unprecedented. But the facts are outrageous, and the violation is obvious. And the Sixth Circuit has decided, I think in the Wharton case following the authority of the Supreme Court, that in cases which are obvious and perhaps outrageous, as this one is, you don't need a prior case specifically. Chief Ahrens's letter, his comments to Pastor Cousins after the fact, made clear that he knew that his people, his people meaning the police officers, had no business being in that church. He said so. And from this point forward, we're not going to go into a church again. Don't bother calling us for general security or anything else. Okay. Well, thank you very much. Thank you to both counsel. We'll take the matter under advisement, and the clerk may adjourn the court. Thank you.